Court is now in session. Our next argument for today is 2019 3 1 0 0 9 in the matter of Louisiana Pellets Incorporated. You may proceed with your argument. Good morning and may it please the court. I'm Rebecca Veith. I'm here on behalf of Craig Jalbert, the chapter 11 liquidating trustee for German Pellets Louisiana LLC and Louisiana Pellets Incorporated. The trustee seeks to avoid a 3.6 million euro obligation and 1.2 million euros in transfers made in favor of vessel. Because when German Pellets, which I'll call G. P. L. A. incurred that obligation and made the payments, it was not demonstrably likely or not reasonable to expect that G. P. L. A. Was going to receive any value from that obligation or those payments. The trustee seeks to avoid this obligation in these payments under Section 5 48 of the Bankruptcy Codes constructive fraud provision that allows a trustee to avoid obligations that are made within two years of the bankruptcy filing when a debtor is insolvent. If the debtor receives less than a reasonably equivalent value. Now, this is not the actual fraud provision of Section 5 48. These transactions or payments can be made at arm's length, but they provide such little value to the debtor that they are constructively fraudulent. The first two prongs of the in dispute. So the only thing this court has to consider today is whether G. P. L. A. Received a reasonably equivalent value, and this court should do so using a de novo review because the bankruptcy court's methodology for its valuation was incorrect. As to the obligation, the bankruptcy court did not even consider whether it was constructively fraudulent, even though the trustee did seek to avoid it. As to the payments, the court assumed that all payments made pursuant to a contract are per se for reasonably equivalent value. But it also determined that the payments provided an expected future benefit in the form of the second half or a phase two of the wood pellet facility that G. P. L. A. Was constructing. But the court didn't conduct any analysis into evidence that would have tended to prove or in the trustees position disprove that the debtor was likely to get any benefit by value from vessels perspective, the transferee, and that's not the inquiry here. So what's relevant to this court's review is that G. P. L. A. And vessel had contracted in 2013 for vessel to construct some equipment for the wood pellet manufacturing facility that G. P. L. A. Was building. However, a year later, in February of 2014, the parties amended that contract via a change order sort of cut the contract in half. It said that vessel would only construct and G. P. L. A. Would only pay for half of the equipment originally contemplated, and this was for a phase one of the facility. If phase two were to be constructed, it would have to be added back to the contract later via another change order. Uh, despite this agreement, though, in September of 2014, vessel sent G. P. L. A. An invoice for phase two work. That invoice was for 200,000 euros, and it was doing 10 days, but it was not paid on time. It wasn't paid until December of 2014. Um, when and then shortly thereafter, vessel sent yet another invoice for phase to work. This one was for 400,000 euros, and it was also do within 10 days. This one was also not paid on time. It was not paid until April of 2015. Shortly before it was paid, though, the parties did enter into a second change order, and that's the order added some of phase two back to the contract, but not all of it. It contemplated that vessel would construct about half of the equipment required for phase two for what was called Phase two A. And for this obligation, G. P. L. A. Would pay 3.6 million euros. Um, vessel admits, though, that after this contract was entered, it performed no work for phase two of the facility. The work that it had performed, which it did before April of 2015. So before it received all but one of the payments was only worth about 265,000 euros. The contract called for milestone payments to be paid monthly after the contract was signed. But vessel didn't send another invoice until August of 2015, and this one was for 600,000 euros, and it was paid in installments of 200,000 euros throughout August and September of 2015. So the trustee seeks to avoid that. Yes, I know that, you know, it's not an actual fraud case. And so I'm wondering why would G. P. L. A. Agree to these contracts if it wasn't for anticipated value? It's not like their president was making money on the side. This kind of stuff that occurs in these insider deals. So what is the logic of this deal? But that they thought that they would keep on keep it on, and then it didn't work out. Well, the I do think there's evidence that G. P. L. A. Thought that it would keep, uh, constructing the facility. But just because G. P. L. A. Thought that I don't think that means that it's actually true. I think the circumstances here show that it was very unlikely that the second half of the facility was going to be constructed, particularly with the way that it was splintered in again because by splintering it in half, G. P. L. A. Wasn't even going to get all that it needed from vessel for phase two of the facility. It would have to enter into another obligation to get there. So I think what the circumstances show is a company that really doesn't have the funds to construct this facility and is making bad business decisions by deciding to let me ask you this. When we're analyzing reasonably equivalent value, uh, we're doing it at the time. Okay. And so how much deference, if any, should the judge give to the consideration of the now debtor than transactor? Because we all know, boy, if we'd known Covid was coming, we wouldn't have built this new restaurant that is geared towards cozy seating. Okay. Uh, but we didn't know that when we built the restaurant. So looking at it now, you say that was a terrible decision. But looking at it at the time when everybody wanted cozy restaurants, it made sense. Well, so you look to the value to the debtor, but from the standpoint of the creditors. So you look to how realistic it was to expect that the debtor was going to get that value. So the Covid example is actually that's a good one because it's sort of similar to this court's Fairchild case, where this court did find reasonably equivalent value on a speculative future benefit. But what was going on in Fairchild was that this debtor was making payments for fuel, and they totaled only a couple $100,000. But the debtor could have realized millions of dollars, and it was very highly likely that the sale was going to occur on the sale of the airline. The separate airline company was what the debtor was making the payments for because there was a buyer who had been identified. Now, you know, in a unexpected twist, this other airline wouldn't let the airline that the debtor was making the payments on behalf of share their codes. So the sale couldn't go through. So that was although there was a demonstrably high likelihood something unexpected like Covid happened. But here there wasn't even a demonstrably high likelihood that this was going to provide an expected future benefit. Because the bankruptcy court, Louisiana Revocatory Act itself, what does that add to this analysis? To what extent is it dependent? Derivative, really, of the primary bankruptcy analysis. So the revocatory action was let me have one. I'm sorry. I understand that it phrases the metric of in a bit different way. But explain to me how you can lose on the main issues of federal law, but then avail under the Louisiana law. Sure. So the revocatory action is in civil code Article 2036. And that article says that a creditor can annul any act of the debtor that causes or increases its insolvency. And one reason why you could succeed on that but not succeed on the federal 548 analysis is because that analysis does not like the 548 analysis turn on a question of reasonable equivalence. It's a dollar for dollar analysis. So if the act dollar for dollar increases the that act can be avoided. Well, so here, a 3.6 million euro obligation increasing this. How do you do that? I'm sorry, Your Honor, you kind of cut out. The predicate is that they that they on the bankruptcy law here. Take but yet yeah, the state law you mean by increasing the saw insolvency? It seems that seemed to be derivative of the underlying now. I apologize because in part you cut out a little bit. Yes. Yes. I'm sorry. My speaker sometimes here. My question is, is to what extent that Louisiana law outcome is not derivative really of what of the liability of the analysis under the bankruptcy code itself? Well, it is under the bankruptcy code because it's section 5 44. But Section 5 44 is separate from Section 5 48 because 5 44 applies state law. And so there are many states laws that have uniform fraudulent transfer acts that are modeled off of the bankruptcy code, and those have a fair consideration or reasonable equivalence written into them. But Louisiana state law does not. I mean, what if you paid $20,000 for a car? Well, your bank accounts gone down, but you have this $20,000 car. Now, of course, cars lose value very quickly. But nonetheless, would you say that was necessarily a dollar for dollar creation of insolvency? Oh, no, because I think there you have the car. But here the debtor doesn't have anything because number one saying that there it's not the value of the future contract. It's did you get something in your hand? So if they had paid 200,000 and gotten part of the wood pellet bucket or whatever it is, then that might have been good enough. Even if that wood pellet bucket by itself didn't do much, they would have at least gotten something. That's right. And what they what the evidence stipulated shows that they got is only 265,000 euros worth of work. So there were 1.2 million euros in payments made and only 265,000 euros worth of work. But importantly, that was all done before this obligation was even incurred. So when GPLA incurred this 3.6 million euro payment obligation thereafter, it got absolutely nothing in return from vessel. And this hope of a phase two of the facility was highly unlikely to occur because there's too many contingencies that would have GPLA would have had to complete in order to get phase two. It would have had to make good on this contract, which the evidence shows that it wasn't really able to because it was having trouble making the payments. Then it would have had to enter into another contract with vessel to get the rest of the equipment it needed from vessel for phase two. And vessels only one subcontractor for phase two. So it would have had to potentially enter into all these other obligations. And only at that point would it get a wood pellet manufacturing facility capable of producing income. The circumstances here really also to me, evidence, something that this court should take a closer look at, because vessel is going to make a lot of these milestone payments, they're going to say, well, we if you have a milestone payment obligation, it doesn't matter what we do, you just have to make the payments, but they weren't even invoicing, along with the milestone payment. The next invoice they sent was four months later, this was a six month contract. So the equipment was supposed to have been delivered in six months, they admit they were doing no work, and they only sent one more payment invoice. So the circumstances just don't show contracting parties who had a reasonable expectation that this was going to come to fruition. Um, I know I only have a couple minutes left. So one final point I want to make is that the bankruptcy court also made much of this concept of the payments being made on antecedent debt, because they were pursuant to a contract, it's important that the first payment, there is no antecedent debt, there's no contract in place, it's invoiced and paid before the contracts ever entered. The second one is invoiced before the contracts ever entered, and then paid after the contract writes in a post hoc justification for it. But it's also not the law that just because the payment is made on a contract, it's for reasonably equivalent value, you have to look at if the contract calls for the payments to be made for an amount way more than what the debtor does or could receive. So here, if this contract called for the debtor to make 1.2 million euros of payments, and eventually 3.6 million euros of payments in order to get no work, because admitted vessel did not perform work after the contract was entered. And the work that it did perform was only worth 265,000 euros, far less than the money that it received, then that is just not a contractual obligation for reasonably equivalent value. Instead, the obligation is far outside of what the debtor ever could have received. Finally, vessel is going to probably argue that no matter what, we can't avoid four of these payments because GPLA's parent company made them. That's true, but that relevant analysis is not legal ownership, if that's something that is considered, but control is most decisive. And the evidence that trial showed that GPGMBH was controlled by the same person as GPLA, he made all the decisions about payments, he paid all of GPLA's creditors through GPGMBH's account. So those funds in the account were available to all the creditors, including vessel, and therefore they're properly avoided as property of the estate. If there are no further questions, I'll yield my 20 seconds to rebuttal. Thank you, counsel. Mr. Crawford, you may proceed. Okay, I had to unmute myself. I apologize. Good morning, your honors. Michael Crawford of the law firm Taylor Porter Brooks and Phillips on behalf of the appellee, Vessel GMBH. You know, when I was preparing for this oral argument, there was one aspect of this case that was bothering me, and it was this notion of reasonable equivalent value with respect to the threshold issue of whether the obligation could be avoided under section 548. I would like to start there, because we don't get, we don't really get to the payments themselves until we look at the obligation. In this case, the light bulb came on for me, actually, when I reread Judge Jones's opinion in the McConnell case, which is cited in our brief at page 21. That's 934 Fed Seconds 662. And that's when the light bulb came on for me with McConnell, and here's the reason why. In the McConnell case, the bankruptcy court conducted a trial where one of the principal issues was the value of an apartment complex in relation to the purchase price in the And in that case, the purchase price was $819,000. So that's the one value. And they had a trial, and the opinion makes clear that the sides had competing appraisals and quite a bit of testimony as to how much the property was worth. And at the end of the day, a determination was made that the property was only worth $320,000, whereas the purchase price was $819,000. And Judge Jones commented that it seemed self-evident as the bankruptcy court found the property only worth $320,000 at last agreed closing date is not of a reasonably equivalent value for the $819,000 total purchase price. In that case, the debtor had made $600,000 worth of deposit payments as well. Here's why that's important here. We had a trial before the bankruptcy court. And I've made reference in the brief to the fact that there really wasn't a lot made of avoidance of the underlying obligation. Okay. And here there was no testimony. There's no testimony in the record challenging whether the $3.6 million euros was reasonably equivalent to the contemplated services and product to be provided by Vessel under the contract. Okay. Judge Haynes made a very good point when she brought up this notion of hindsight. At the time, at the time, Vessel had already completed a twin plant, an identical plant had already been completed and was up and running and producing. That's in the record. So we have a pretty good idea. The bankruptcy court had a pretty good idea of the value. Because of financial considerations, the debtor wanted to change the game plan for the second plant. There's no question. There's no dispute about that. So we had a trial where there was a stipulation that this contract, the modified contract or change order, was entered into in good faith, arm's length, in the ordinary course of business between these two contracting parties, which the record reflects. We had already built them two plants. So there was a familiarity with these contracting parties. That is the key point. There was nothing at the trial. The trustee could have obtained an appraiser to try to make the case that the $3.6 million euros was not reasonably equivalent to the value that was going to be provided by Vessel. They didn't do it. I was there. We didn't have that trial, your honors. As a result, the closest we came to having anything in the record suggesting, uh, that the that the value of the plant was even considered in the trustees case in chief was my cross examination of the trustees expert witness, where I confirmed that Mr Alexander was not hired to a pine on the value of a completed plant or any of the things that Vessel did with respect to building that plant. So that was that was really fatal to the trustees position. It's been a suggestion in the brief, not it was more implicit. I think I may be reading too much into it, but it seemed to suggest the trustee, uh, said the, uh, that the bankruptcy court's methodology would suggest we need to remand this or you. I'm sorry. You all need to remand this case so that the bankruptcy court can consider, um, uh, consider the issue of whether the obligation itself should be avoided. Uh, that would be entirely inappropriate, your honors, because trustee that would be given the trustee a second bite at the apple. Uh, the trustee had every opportunity to challenge whether the 3.6 million euros for for the work contemplated in the second change order was reasonably equivalent. That's what happened in the McConnell case. It didn't happen here. So what was Judge Colway left with at the end of the day? Stipulation as to the fact that there was a valid contract entered into in good faith, but by a party that had just constructed the plant for for this debtor. Um, not long before, um, we have that and we have nothing concerning reasonably equivalent value of the purchase price in the contract. What we did have. What about the argument that to get anywhere valuable, they would have had to have yet another contract after this one. Well, that that is true, your honor. There was, uh, that was based on the debtors change to what we were doing. Uh, as you pointed out earlier, uh, with the benefit of hindsight, um, perhaps, you know, I'm pretty sure vessel would not have would But at the time that this at the time that these payments were made pursuant to this change order, there was there was no reason to believe that it was that the debtor was not going to be able to raise the capital to complete the plant. And I point out that the, uh, the trustees own fact witness, which was Mr Luden Mueller, uh, appearing, uh, remotely via a stipulated deposition transcript, testified that even on the day of the filing of the bankruptcy, much later, they still believed they were going to fully complete the second plant and and get a 500,000 metric ton production. That's what the first plant was doing. And and they believed, even on the date of the filing of the bankruptcy, that they were going to do that. Um, you know, again, it's hindsight to go back now, five years later and say, Well, those guys were nuts. They weren't going to find the money, but they had just paid us for one plant. So if you look at it contemporaneously, when this deal was struck, which was first verbal and then memorialized in a in a second change order, um, then then that that goes away, that goes away. So what we had was no obligation. I'm sorry. Was the verbal contract binding? You said it was verbalized. And then wouldn't it have to be in writing? Uh, well, we we don't take the position that it had to be in writing. These parties have been dealing with each other for years. I don't mean like you and I agree to do this. We know we're gonna do it. I mean, if if you had to file a lawsuit to recover on the contract, did it have to be in writing this? No, no, I don't. I don't see any any reason why it wasn't a contract to buy and sell real estate, which is one of the types of contracts that would required to be in writing. These parties have been dealing with each other for years. Like I say, this was our third plant, and this was a change order to an overall contract that that contemplated two plants being built. Um, so what we have is we have a case presented by the trustee, uh, at trial where there was no evidence at all adduced with respect to whether 3.6 million euros was the reasonable equivalence of the contemplated scope of work in the change order. Um, because of that, because of that, uh, the decision is much easier, and it was much easier for Judge Colway, uh, to make with respect to whether payments, uh, could be avoided pursuant to that contract. Judge Colway ruled that there was a contract, and therefore these payments were, in fact, antecedent debts made in accordance with the with the contract. Um, you know, there's a reason why there's not a lot of case law under Section 548 of the Bankruptcy Code with respect to, uh, with respect to, uh, situations like this where you're talking about payment of an antecedent debt. I think Judge Higginbotham brought up a good point earlier when he asked about, uh, the revocatory action. Um, each payment on an antecedent debt, uh, serves to reduce the contract liability of the debtor dollar for dollar. That's what happened here, okay? The, the, the progress of building the thing, whatever it was Vessel was constructing, I don't think any of us know for sure, but I'll just call it the thing. The progress of building the thing in Germany was not tied to a payment schedule, okay? So, as Judge Colway found, there was a three, $3.6 million obligation. There was, uh, roughly a third of that was paid. That reduced the contract liability of the debtor dollar for dollar. That doesn't increase insolvency. That's a balance sheet neutral transaction. And as I pointed out in the brief, 548, section 548 of the, of the bankruptcy code, uh, specifically subsection D2 capital A defines value, defines value as satisfaction. I'll just, I won't, uh, paraphrase value means property or satisfaction or securing of a present or antecedent debt of the debtor. Okay. So that's why you don't have a lot of cases, uh, like this, a lot of case law on this, because what the trustee had was the makings of a pretty decent preference case, but the payments were outside the 90 day period. So all this talk about the payments were late. They were inconsistent. That's preference talk. Each payment reduced the contract liability and gave value. So, uh, if, if the bankruptcy code defines payment of an antecedent debt as value, it is, it, it's impossible for a court to find that value is not reasonably equivalent value. It's actually better. It would be like, uh, uh, you know, something tasting like chocolate being a reasonably equivalent, but, uh, value would be no, it is chocolate. Uh, so that's why there aren't a lot of cases on this, but the cases on it that we cite in our brief, make it very clear that trustee cannot avoid payments made on account of antecedent debts. Uh, the treasure Valley opinion that we cite to, uh, even though it's an Idaho bankruptcy case, certainly not binding, wasn't binding on judge Colway. It's certainly not binding on this court, but it's a pretty doggone good opinion. It was well-reasoned and it dealt with the construction through installment payments on of all things, a wood pellet plant. Uh, the fact that it was a wood pellet plan is just kind of amusing, but the installment nature of the contract is, is a very telling because in that case, uh, like here, uh, the, the, the, uh, payments were made, uh, but the debtor defaulted, uh, prior to the creditor's obligation to, to finish the plant. And, and, uh, in the treasure Valley case, the court cited two separate, uh, bases for saying that reasonably equivalent value, uh, was, uh, was, was had first being of course, satisfaction of antecedent debt. The second one was the continued vitality of the contract. Um, you know, we don't, nobody knows what Mr. Libel was doing to try to, uh, attract capital to try to, uh, uh, keep this company from imploding and ultimately landing in bankruptcy court in Louisiana. But it's pretty clear from the record that the debtor was making efforts to obtain the contract was important in that endeavor. Again, this isn't an actual fraud case. Mr. Libel didn't testify. There's no suggestion that vessel was part of some scheme or anything. We were just building whatever it is we built in Germany, uh, for these, uh, wood pellet plants. And, um, so the treasure Valley case, uh, looked at that and considered the continued vitality to be an important element. And judge Colway embraced that in his opinion as well. Uh, finding that, uh, again, without the benefit of hindsight that these payments maintain the vitality of that contract, kept, kept the prospect of law alive of there being a completed plant that would produce 500,000 metric tons. The, the notion now five years later that the trustee says, this is fantastical that, that, that, uh, anybody could possibly believe back in 2014 and 2015, that we weren't going to be able to complete this plant is, is, is frankly, um, uh, should not be given any weight at all. We don't know anything of the sort. We know that we had built one plant and they paid for it, but largely we didn't get paid in full, but close enough. We know that this contract did not require vessel to pay, to deliver anything to the United States until 90% of the contract price was paid. They didn't come close. There's no question who breached the contract here. And the point I made about milestone payments versus progress payments is it doesn't matter. It doesn't matter in this situation, how much we had actually constructed by the time the debtor breached the contract. Point being is when 90% was paid, we had a contractual obligation to deliver the thing to the United States. And we never got there. Obviously, uh, the trustees kind of left in the shoes of the debtor with respect to who breached the contract here. Um, I, I have very little time left. So, uh, what I would suggest to the court is, uh, again, if the trustee wanted to annul or avoid the underlying contract, it was incumbent upon him to put on a case to challenge the 3.6 million euro consideration. He didn't do that. For whatever reason, he didn't do it. Uh, and Judge Colway was well within his discretion to find based on the stipulation that there was a valid contract between the parties and that these were payments made on account of antecedent debt. Again, from there, it's a pretty easy case. Reduced dollar for dollar balance sheet neutral transaction. It is irrelevant whether the debtor actually got the thing because the debtor breached the contract. The only the only the only thing we know, the only testimony we had at the trial on this was the testimony of Mr Trostner that said we had built them two plants. If they had paid us, we'd have delivered this one to now. Maybe that's self serving, but the trustee did not present anything to the contrary. We never got there. We never got close to the point of 90% where there was a contractual obligation to deliver something. We had full 100% authority on the timing by which we constructed the thing. It was entirely in our purview to  Thank you, Your Honors. Thank you. We have your argument. Is it Miss Beath or vice or vase? How do you correct? I'm sorry. It's vice. Vice. I apologize. I want to get it right. You may proceed with your rebuttal. Okay, thank you, Your Honor. I first want to correct one slight factual inaccuracy. Mr Crawford just said in response to your question, Judge Haynes, about whether it would have had to be in writing for the vessel to make these make this equipment without the second change order. It would have. The first contract requires notices to proceed to be in writing. So once that first change order amended the contract to say that there was no phase two in order for vessel to proceed with work on phase two, it would have had to receive a written notice from G. P. L. A. And that notice doesn't exist until the second change order in April of 2015. Was that was that argued to the bankruptcy judge? I believe it was in the contract itself is in evidence, and I think that was this argument presented so that the court could take that into consideration. And if that's what you're going to be relying on now, I think that it was. I mean, the crux of the trustees argument at trial was that until the second change order existed, there was certainly no obligation for G. P. L. A. To make the payments and for vessel to construct the equipment, and that's because it had to be in writing. Um, but I also, um, I want to point out that Mr Crawford he makes much of. Well, there's no evidence as to the value of the 3.6 million euro obligation, and he's talking about the value of what vessel was going to construct. And, um, Judge Elrod, you've actually explained this very succinctly in some of your Gulf Channel opinion. Value here is not the value of the equipment in the abstract. It's what the value of that obligation to get that equipment would have given to the debtor and what Mr Crawford just admitted to Judge Haynes is that in order for the debtor to get the full value of what vessel was to construct for phase two, it would have had to enter into another obligation. So at the time that this obligation was entered, there's just not a high likelihood and the likelihood of the trustee presented at trial that there was going to be any equipment from vessel for phase two, which again, vessels equipment, which it's conveying and cooling equipment. So I do know what it is. Um, it's not going to provide a full phase two that can produce wood pellets. So that's the difference with the Treasure Valley case, um, where that contract was for the entire wood pellet manufacturing facility. And what the court there found was important was that if that facility had been constructed, there would have been this income producing asset that the creditors could have maybe, um, you know, used to get money. If we get all of vessels equipment for half of half of the wood pellet manufacturing facility, that's not what we have. We have some equipment that actually the testimony elicited from Mr Trostner at trial was that it's specific to this plant. It's not capable of being resold because of a larger size and most of this kind of equipment. So we have some equipment that can't is not the full equipment that the debtor would get from vessel because the debtor would have had to enter into yet another obligation. And it's also can you answer? Um, hosting Council, though, says that your experts weren't weren't hired to applying on the value. Um, and I'm wondering, how can we say then it's not the right value because there was also there was no evidence from vessel as to the value either. And what our expert was provided to do was to speak to the solvency analysis, which ultimately, at the end of the day, was stipulated to and also to analyze G. P. G. M. B. H. S. Uh, bank records to show that the payments from that account were being made to was not likely that this facility was gonna be constructed. And that's the evidence that this debtor, um, owed millions of dollars of obligations on these bonds that it was, um, getting to construct the facility. It was making haphazard payments. It was entering into an obligation for only some of the equipment because that's all it could afford. At the time, it would have had to, you know, do something, get more money in order to get the full amount of the equipment. So that's what the evidence is as to the likelihood of value. So it's a little bit like on Wheel of Fortune. When you win the half car, it doesn't really have any value unless you get the other half. I think that's a very good way of putting it, especially because what we do know is that all that vessel did here was a very small amount of work for what it was. G. P. L. A. Contracted for it to build. So G. P. L. A. Paid 1.2 million euros, and all the debtor received reasonably equivalent value here. Thank you very much for your time. Thank you. We have your arguments. We appreciate the arguments of both counsel in this case, and it is submitted. Thank you.